UNITED STATES of America,
Plaintiff–Appellant,

v.

John W. RUTANA, Defendant–Appellee.

No. 90–3343.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 4, 1991.

Decided May 8, 1991.

**1156**

Gregory C. Sasse, Asst. U.S. Atty. (argued), Cleveland, Ohio, for plaintiff-appellant.

Charles E. Dunlap (argued), Youngstown, Ohio, for defendant-appellee.

Before KENNEDY and NORRIS, Circuit Judges, and MILES, Senior District Judge.*

_____

* The Honorable Wendell A. Miles, Senior United States District Judge for the Western District of Michigan, sitting by designation.

MILES, Senior District Judge.

The United States appeals the district court's downward departure from the guidelines in sentencing John W. Rutana on 18 counts of knowing discharge of pollutants into a public sewer system in violation of the Federal Water Pollution Control (Clean Water) Act, 33 U.S.C. § 1251 *et seq.* For the following reasons, we reverse and remand the case to the district court for resentencing.

## I

John Rutana was a part-owner and chief executive officer of a now-bankrupt corporation known as Finishing Corporation of America ("FCA"). In late 1985, FCA began operating a metal finishing plant in Campbell, Ohio. The plant was located directly across the street from the city of Campbell's Waste Water Treatment Plant ("CWWTP").

FCA's plant was constructed with a plastic discharge pipe, which was intended to transport sulfuric and nitric acids. This pipe led into a city sewer line, which in turn led directly into CWWTP.[1] During late 1986 and early 1987, CWWTP, which had recently been renovated, began experiencing problems associated with chemical waste water discharges coming from the FCA plant. CWWTP's manager notified Rutana of these problems, which included two massive "bacteria kills" at CWWTP. In addition, the Ohio Environmental Protection Agency sent a letter to FCA, which, among other things, contained a copy of the federal regulations pertaining to chemical waste water discharges. No additional problems associated with FCA's activities were documented for approximately one year thereafter.

Although Rutana and John C. Barnes, FCA's plant manager, claimed to have met in February, 1987 to devise a "mixing plan" to neutralize the acid and alkaline discharges, the ineffectiveness of this alleged plan became apparent in March, 1988, when

_____

1. The CWWTP discharges into the Mahoning River, a source of drinking water for a number of communities.

CWWTP's problems associated with the FCA discharges resumed. A federal investigation ensued. Despite repeated attempts by the City of Campbell and the Ohio EPA to get FCA to take action to stop the discharges, and despite Rutana's obvious awareness of the problem, at least 18 separate instances of illegal discharges were documented during 1988. Two of these discharges resulted in injury to a CWWTP employee, who was burned while trying to sample the substances coming into the treatment plant from FCA. After federal agents threatened to obtain an injunction to prevent further discharges, Rutana voluntarily agreed to close the FCA plant, although at least one illegal discharge occurred in December, 1988 after the plant was supposedly closed.

On May 31, 1989, Rutana was indicted by a grand jury on 18 counts of "knowingly discharging and causing to be discharged pollutants which caused corrosive structural damage and which had a pH of less than 5.0 into a public sewer system and, thereby, into the Campbell, Ohio Waste Water Treatment Plant ... in violation of national pretreatment standards," all in violation of 33 U.S.C. § 1317(d) and § 1319(c)(2)(A); on two counts of knowing endangerment of CWWTP employees, in violation of 33 U.S.C. § 1319(c)(3); and on two counts of making false statements in a matter within the jurisdiction of the United States Environmental Protection Agency in violation of 18 U.S.C. § 1001.[2] Also indicted were FCA itself and Barnes, both on 18 counts of knowing violation of pretreatment standards and on two counts of knowing endangerment.[3] Dr. Richard Fiorini, a minority shareholder of FCA, was indicted on 18 counts of negligent violation of pretreatment standards, under 33 U.S.C. § 1319(c)(1).

On October 2, 1989, pursuant to a plea agreement, Rutana pled guilty to the 18 Clean Water Act violations, and the remaining charges were dismissed. Rutana's co-defendants also pled guilty pursuant to plea agreements with the government.

A presentence report was prepared by the probation officer. Under 33 U.S.C. § 1319(c)(2), the maximum penalty which could have been imposed upon Rutana for each violation was three years imprisonment and a $50,000 per day fine. The presentence report calculated that the guidelines indicated a term of imprisonment of 27 to 33 months, based upon an offense level of 18 and a criminal history category I (Rutana had no prior offenses). United States Sentencing Commission, *Guidelines Manual* (hereinafter "U.S.S.G."), Ch. 5, Part A (Nov.1989) (Sentencing Table).[4] The report's calculation of the offense level, which is not disputed on appeal, is as follows:

(1) Base offense level of eight (8) for mishandling of hazardous or toxic substances, under U.S.S.G. § 2Q1.2(a).

(2) Increase by six (6) levels, for repetitive discharge, under U.S.S.G. § 2Q1.2(b)(1)(A).

(3) Increase by four (4) levels, for disruption of a public utility, under U.S.S.G. § 2Q1.2(b)(3).

(4) Increase by two (2) levels, for playing a leadership role in the activity, under U.S.S.G. § 3B1.1(c).

(5) Decrease by two (2) levels, for acceptance of responsibility, under U.S.S.G. § 3E1.1(a).

In detailing Rutana's employment record, the report noted that Rutana was also the owner and chief operating officer of another business, Viking Manufacturing Company, which employed 26 people. The probation officer also noted that neither the government nor defense counsel had presented him with factors to warrant a departure from the guidelines.

---

**2.** These latter two counts were based upon two instances in which Rutana allegedly lied to authorities about having contracted to clean up the discharges.

**3.** Pursuant to a superseding information, Barnes was later charged with 17 counts of negligent, rather than knowing violation of the Clean Water Act.

**4.** The events giving rise to counts one through eighteen of the indictment occurred between May 26, 1988 and December 9, 1988. The sentencing guidelines were therefore applicable.

A sentencing hearing was held on March 2, 1990, at which all four defendants were sentenced. The district judge indicated that he accepted the facts and findings contained in the presentence report on Rutana. Nevertheless, the district court departed downward from level 18 to level 6, sentencing Rutana to five years probation, combined with 1,000 hours of community service. In addition, the court imposed a fine on Rutana in the amount of $90,000 (or, $5,000 per violation), and a special assessment in the amount of $950. The government's appeal followed.[5]

## II

■ This circuit has established a three-step procedure to be used in reviewing downward departures from the guidelines. First, we determine whether the case is sufficiently "unusual" to warrant departure. *United States v. Brewer*, 899 F.2d 503, 506 (6th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990).

Second, we determine whether the circumstances, if conceptually proper, actually exist in the particular case. That assessment involves factfinding and the trier's determinations may be set aside only for clear error. See 18 U.S.C. § 3742(d).

Third, once we have assured ourselves that the sentencing court considered circumstances appropriate to the departure equation and that those factors enjoyed adequate record support, the direction and degree of departure must, on appeal, be measured by a standard of reasonableness. 18 U.S.C. § 3742(e)(2); et al.

*Id.* at 506 (quoting *United States v. Diaz–Villafane*, 874 F.2d 43, 49 (1st Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989)).

■ In sentencing Rutana, the district judge gave the following explanation for his downward departure from the guidelines:

The presentence report has a guideline range of 18, Category One, which is 27 to 30 [6] months. This Court for the reasons stated now, and because this defendant has a business employing some people and may put them out of work, and I'm going to depart downward to an Offense Level of 6, Category One.

Thus, the district judge clearly relied upon Rutana's ownership of another business which, he concluded, might fail if Rutana were to be incarcerated.

Our *de novo* review leads us to conclude that the circumstance expressly relied upon by the district court does not make this case sufficiently unusual to warrant a downward departure from the guidelines. The guidelines specifically state that a defendant's socioeconomic status is not relevant in the determination of a sentence. U.S.S.G. § 5H1.10; *Brewer*, 899 F.2d at 508. Furthermore, even assuming that Rutana's imprisonment would lead to the failure of his business and the loss of his employees' jobs, this fact does not distinguish Rutana from other similar offenders. " '[T]here must be something "special" about a given offender, or the accouterments of the crime committed, which distinguishes the case from the mine-run for that offense.' " *United States v. McDowell*, 902 F.2d 451, 455 (6th Cir.1990) (quoting *United States v. Aguilar–Pena*, 887 F.2d 347, 350 (1st Cir.1989)). We find nothing special about an industrial polluter who also happens to be an employer. The very nature of the crime dictates that many defendants will likely be employers, whose imprisonment may potentially impose hardship upon their employees and families. In sum, Rutana's status as a business owner simply does not distinguish his case from the "mine-run" of cases involving the discharge of prohibited effluents into the environment, and is not a legally sufficient basis for downward departure.

---

**5.** This court has jurisdiction over the appeal pursuant to 18 U.S.C. § 3742(b), despite the government's belated submission of certification of written approval of the Solicitor General. *United States v. Smith*, 910 F.2d 326, 328 (6th Cir.1990).

**6.** This reference to 27 to 30 months appears to be a misstatement by the district judge; the guidelines range was in fact 27 to 33 months.

■ The district court appears to have relied upon other factors in its downward departure, factors which it did not articulate during its sentencing of Rutana. Fiorini and Barnes, who were sentenced immediately preceding Rutana at the same hearing, also received downward departures to probation, although the district court gave different reasons for these departures. In sentencing each of these co-defendants, the district judge expressed the opinion that the minimum fine, which he believed to be mandatory for each count, was "harsh" in combination with the term of imprisonment called for by the guidelines. In sentencing Barnes, the district court also expressed some concern that FCA did not have the economic "wherewithal" to comply with changing federal effluent standards.

The imposition of a "harsh" fine is not a proper basis for departure from the guidelines. The guidelines have already taken fines, even large ones, into consideration. *See* U.S.S.G. § 5E1.2(c)(3) (specifying minimum fine of $6,000 and a maximum fine of $60,000 for offense levels 18 and 19).[7] Economic considerations likewise do not provide a basis for downward departure. U.S.S.G. Ch. 1, Pt. A, Introduction 4(b) (economic hardship may not be considered as grounds for departure); U.S.S.G. § 5K2.12, p.s. (economic pressures upon a business do not warrant a decrease in sentence).[8]

■ Rutana argues that because his sentence is now "uniform" with those of Barnes and Fiorini, resentencing him could result in the type of disparity which the guidelines were intended to prevent. *See* 18 U.S.C. § 3553(a)(6) (sentencing court must consider, among other factors, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct). However, departure in order to achieve conformity among co-defendants is not appropriate where there is a basis for disparity. *United States v. Nelson*, 918 F.2d 1268, 1273 (6th Cir.1990). The record indicates that there is indeed some basis for disparity. Both Fiorini and Barnes pled guilty to negligent, rather than knowing, violations of the Clean Water Act. U.S.S.G. § 2Q1.2 assumes knowing conduct, and downward departure may be warranted in cases involving negligent violations. U.S.S.G. § 2Q1.2, comment. (n. 4). In addition, both Fiorini and Barnes received decreases of four levels for their "minimal participant" roles in the offenses, while Rutana received an increase of two levels for his leadership role. Rutana's situation was not the same as that of his co-defendants, and we decline to hold as a matter of law that his sentence should be the same.

### III

■ We appreciate the difficult task of the sentencing judge, and do not wish to displace his discretion in resentencing Mr. Rutana. In our decision, we have simply indicated those factors which are improper bases for departure. However, we stress that in imposing sentence, the district court should not only eliminate consideration of those factors which the guidelines have already taken into account or expressly deemed irrelevant; he should also consider "the full panoply" of relevant sentencing factors, aggravating as well as mitigating. *Brewer*, 899 F.2d at 511. We remind the district court that the burden of persuading the sentencing court that a downward departure is warranted rests with the defendant. *United States v. Bogas*, 920 F.2d 363, 369 (6th Cir.1990). Furthermore, the court must state the specific reason(s) for any departure. *Id.; United States v. Fitzwater*, 896 F.2d 1009, 1011 (6th Cir.1990).

---

7. Furthermore, as we note *infra* in Part III, the district court's imposition of Rutana's fine was based on an erroneous assumption that the relevant statute mandated a fine for each count.

8. Federal effluent limitations are established with economic considerations in mind. *See* 33 U.S.C. § 1317(a)(2) ("Each toxic pollutant … shall be subject to effluent limitations resulting from the application of the best available technology economically achievable[.]"). Effluent standards are reviewed and, if appropriate, are revised at least every three years. 33 U.S.C. § 1317(a)(3).

**1160**

█ Finally, in resentencing, the district court should also reconsider whether to fine Rutana on all 18 counts of his conviction. In setting the fine, the district court was acting under the erroneous impression that the $5,000 per count fine was a mandatory minimum. While the total amount of Rutana's fine was technically proper, and while the guidelines state that some fine shall be imposed in all cases, *see* U.S.S.G. § 5E1.2(a), the statute under which Rutana was sentenced does not require a fine for *each* violation. Rather, 33 U.S.C. § 1319(c)(2) gives the sentencing court the option of imposing a fine or imprisonment, or both.[9] Although the government did not object below to the district court's erroneous approach in imposing Rutana's fine, we nonetheless deem reconsideration of the fine to be necessary, particularly in light of the need for the *combined* sentence to serve the purposes stated in the guidelines. REMAND this case to the district court for resentencing.

---

**9.** 33 U.S.C. § 1319(c)(2) provides that violations such as Rutana's "shall be punished by a fine of not less than $5,000 nor more than $50,000 per day of violation, or by imprisonment for not more than 3 years, or by both."