**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Thomas A. DeMONTE, Defendant–**
**Appellee.**

**No. 92–3964.**

United States Court of Appeals,
Sixth Circuit.

Argued April 30, 1993.

Decided June 2, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied Aug. 25, 1994.

---

James E. Rattan, Asst. U.S. Atty. (argued), Dale E. Williams, Jr., Asst. U.S. Atty. (briefed), Office of the U.S. Atty., Columbus, OH, for plaintiff–appellant.

Michael J. Valentine (argued and briefed), Merullo, Reister & Swinford, Columbus, OH, for defendant–appellee.

Before: JONES and BATCHELDER, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge, delivered the opinion of the court. BATCHELDER, Circuit Judge (pp. 351–353), and CELEBREZZE, Senior Circuit Judge (pp. 353–356), delivered separate opinions concurring in part and dissenting in part.

NATHANIEL R. JONES, Circuit Judge.

Defendant–Appellee Thomas A. DeMonte pled guilty to computer fraud in violation of 18 U.S.C. § 1030(a)(4). This is the government's second appeal of DeMonte's sentence. Under the federal sentencing guidelines, the district court calculated DeMonte's total offense level at 13, meaning he was subject to 12–18 months of imprisonment. The district court, however, departed downward, lowering DeMonte's base offense level seven levels (to six) and sentencing DeMonte, *inter alia,* to three years of probation and no term of imprisonment. As a basis for this departure, the district court cited the fact that DeMonte liquidated his assets to make restitution and the fact that he provided the government with information about previously undiscovered crimes he had committed. On appeal, the government portrays this sentence as an example of unwarranted judicial favoritism toward white-collar criminals. We affirm in part and reverse in part.

## I. Facts

On March 7, 1991, a one-count Information was filed in the United States District Court for the Southern District of Ohio, charging DeMonte with a form of computer fraud, in violation of 18 U.S.C. § 1030.[1] At his arraignment on March 28, 1991, the district

1. For the underlying facts of this crime, see our decision on the prior appeal, *United States v. DeMonte,* No. 91–3775, 1992 WL 99454, 1992 U.S.App. LEXIS 11392 (6th Cir. May 12, 1992) (per curiam).

court accepted a Plea Agreement entered into by the government and DeMonte.[2]

DeMonte appeared for sentencing on May 24, 1991. The district court did not sentence DeMonte at that time, but entered the following order:

> [T]he court notes that from the presentence report that this defendant has unencumbered total assets of approximately $31,769. Before imposing sentence on this defendant the court directs this defendant to liquidate these assets and pay them over totally to the United States government before the court, and the court will give you two weeks to do that.

J.A. at 36. The district court continued the sentencing proceedings.

When DeMonte appeared for sentencing again on June 21, 1991, counsel for DeMonte informed the court that DeMonte had liquidated virtually all of his assets except the clothes he was wearing and $20 in his pocket. The government advised the court of DeMonte's willing and voluntary cooperation with the government, particularly that he had informed the government of about $30,-000 that he had embezzled about which the government had not known. The government also told the court that, despite DeMonte's cooperation, it would not move for a downward departure. The district court continued the proceedings in order to consider the matter further.

On July 17, 1991, DeMonte again appeared for sentencing. The district court lowered DeMonte's total offense level from thirteen to six based on DeMonte's "extraordinary and unusual level of cooperation," and his

making full restitution to the government to the extent possible. *Id.* at 42–43. Because of this departure, the guideline imprisonment range dropped from 12–18 months to 0–6 months. The district court imposed a sentence which did not include incarceration but which did include three years of probation.

The government appealed this sentence, and in *United States v. DeMonte*, No. 91-3775, 1992 WL 99454, 1992 U.S. App. LEXIS 11392 (6th Cir. May 12, 1992), we reversed the sentence on the ground that the district court did not clearly indicate whether or to what extent it believed DeMonte's conduct went beyond that contemplated in the plea agreement and that contemplated in Section 3E1.1 of the United States Sentencing Commission's *Sentencing Guidelines* [hereinafter U.S.S.G.], which provides a sentencing reduction for defendants who have accepted responsibility for their actions. Thus, on remand, we asked the district court to "clearly articulate the basis for any departure and for the reasonableness of the degree of departure." *DeMonte*, No. 91–3775, Slip Op. at 7.

On remand, the district court remained firm in its imposition of three years of probation and no term of imprisonment. In an Opinion and Order dated August 18, 1992, the district court explained that by liquidating virtually all of his assets in order to make restitution, Defendant's degree of restitution in the instant case, and the manner in which it was made, were so unusual that a downward departure was appropriate. J.A. at 19–20 (citing 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0). The court also pointed to Defen-

---

2. In relevant part, the Plea Agreement provides:
4. Defendant THOMAS A. DEMONTE agrees to testify truthfully and completely concerning all matters pertaining to the Information filed herein and to any and all other computer fraud in which he may have been involved or as to which he may have knowledge.... Pursuant to § 1B1.8 of the Federal Sentencing Guidelines, the government agrees that any self-incriminating information so provided will not be used against the defendant in determining the applicable guideline range for sentencing, or as a basis for upward departure from the guideline range.
5. Defendant THOMAS A. DEMONTE agrees to make restitution in the amount of $46,-514.75 to the United States.

6. If such a plea of guilty is entered, and not withdrawn, and defendant THOMAS A. DE-MONTE acts in accordance with all other terms of this agreement, the United States Attorney for the Southern District of Ohio agrees not to file additional charges against Defendant THOMAS A. DEMONTE based on his activities charged in the Information or based on other computer fraud in the Southern District of Ohio occurring prior to the date of the Information and as to which Defendant gives testimony or makes statements pursuant to this agreement.
J.A. at 5–6.

dant's "extraordinary level of cooperation" as demonstrated by

> providing the government with extensive information regarding crimes with which he was not even charged. Such crimes were unknown to both investigators and the United States Attorney's Office until disclosed by the Defendant. Further, by voluntarily disclosing this information, the Defendant willingly subjected himself to the possibility of more serious punishment. Thus, the Defendant's level of cooperation is also sufficiently unusual to warrant a downward departure.

*Id.* at 20.

The government again appeals DeMonte's sentence.

## II. Discussion

Under 18 U.S.C. § 3553(b),

> The court shall impose a sentence ... within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.

This statement is echoed and augmented somewhat in U.S.S.G. § 5K2.0:

> Where ... the applicable offense guideline and adjustments do take into consideration a factor listed in this subpart, departure from the applicable guideline range is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense.

In *United States v. Brewer,* 899 F.2d 503 (6th Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990), we ex-plained our standard for reviewing departures from the sentencing guidelines:

> First, the reviewing court determines whether "the case is sufficiently 'unusual' to warrant departure." This is purely a question of law.

> Second, we determine whether the circumstances, if conceptually proper, actually exist in the particular case. That assessment involves factfinding and the trier's determinations may be set aside only for clear error. *See* 18 U.S.C. § 3742(d).

> Third, once we have assured ourselves that the sentencing court considered circumstances appropriate to the departure equation and that those factors enjoyed adequate record support, the direction and degree of departure must, on appeal, be measured by a standard of reasonableness. 18 U.S.C. § 3742(e)(2); *et al.*

*Id.* at 506 (quoting *United States v. Diaz-Villafane,* 874 F.2d 43, 49 (1st Cir.), *cert. denied,* 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989)); *see also United States v. Joan,* 883 F.2d 491, 494 (6th Cir.1989) (adopting three-part test enunciated in *Diaz-Villafane* ).

## A. Restitution

■ DeMonte argues that his liquidating virtually all of his assets constitutes "conduct significantly differ[ent] from the norm." U.S.S.G. Ch.1, Pt.A(4)(b). Thus, in his view, the district court's departure passes muster under part one of the *Brewer* test. We disagree, and so we do not need to consider the second and third parts of the test.

We have acknowledged that *voluntary* restitutionary payments may constitute "exceptional circumstances" that justify a downward departure greater than that contemplated in Section 3E1.1.[3] *See Brewer,* 899 F.2d at 509 ("[T]he factor of restitution and remorse was considered under the guidelines, and the defendants' offense level was appropriately reduced by two levels. Unless the defendants have proved that their voluntary repayment of the embezzled funds con-

---

3. Section 3E1.1, comment. (n.1(c)), provides a remorseful defendant who makes "voluntary payment of restitution prior to adjudication of guilt" with a two-level reduction for demonstrating ac-ceptance of responsibility for his/her criminal conduct. Significantly, DeMonte did receive this two-level reduction.

stitutes an 'exceptional circumstance,' a downward departure based on this factor was not warranted."); *see also United States v. Garlich*, 951 F.2d 161, 163 (8th Cir.1991) ("A defendant's voluntary payment of restitution before adjudication of guilt is a factor to be considered in determining whether the defendant qualifies for a two-level reduction for acceptance of responsibility.... Although the district court gave [the defendant] this reduction, we conclude the district court should consider whether the extent and timing of [the defendant's] restitution are sufficiently unusual to warrant a downward departure."); *United States v. Carey*, 895 F.2d 318, 323 (7th Cir.1990). However, DeMonte's restitutionary payments upon liquidation of his assets were not made *voluntarily* before adjudication of guilt, but *pursuant to a court order*[4] and *after adjudication of guilt*. Further, what most impressed the court below was that DeMonte completely liquidated his assets for the purpose of making restitution within a few weeks, yet the court expressly demanded that DeMonte do so. Thus, any "special circumstances" in this case essentially derive from the district court's own order; the district court *created* the special circumstance upon which it relied in departing from the guidelines.[5]

Moreover, as we noted in *United States v. Harpst*, 949 F.2d 860, 863 (6th Cir.1991), "it seems that the Sentencing Commission considered including the ability to make restitution as a possible mitigating circumstance, yet rejected it as a basis for departure from the guidelines. *See* U.S.S.G. § 5H1.10, p.s. (socio-economic status not relevant in determination of sentence)." In accordance with U.S.S.G. § 5H1.10, we may not sentence a poor convict more harshly than a rich convict simply because the rich convict is better able to make restitution. Conversely, however, we should not sentence a poor convict less harshly than a rich convict simply because the poor convict is forced to liquidate assets to make restitution. "In promulgating the guidelines, one of the Sentencing Commission's primary goals was to impose a sentence 'based upon the crime committed, not the offender.'" *Brewer*, 899 F.2d at 507 (citation omitted); *see also Harpst*, 949 F.2d at 863 (noting that sentencing guidelines were, at least in part, "intended to supplant" the "unfortunate practice of disparate sentencing based on socio-economic status"); *cf. United States v. Rutana*, 932 F.2d 1155, 1159 (6th Cir.) ("The imposition of a 'harsh' fine is not a proper basis for departure from the guidelines. The guidelines have already taken fines, even large ones, into consideration.... *Economic considerations likewise do not provide a basis for downward departure.*") (footnote omitted; emphasis added), *cert. denied*, —— U.S. ——, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991). For example, if the defendant in this case were so poor that he had no assets to liquidate, the district court might not have departed downward based on the defendant's extraordinary restitution measures, and so the defendant would in effect have been denied an equal opportunity to receive a sentence of probation rather than imprisonment. It is precisely this kind of discrimination on the basis of economic status with which U.S.S.G. § 5H1.10 is concerned. *Cf. Harpst*, 949 F.2d at 863.

4. *See* 18 U.S.C. §§ 3556, 3663–64 (orders of restitution authorized for violations of provisions of, *inter alia*, Title 18); U.S.S.G. § 5E1.1(a)(1) ("The court shall enter a restitution order if such order is authorized under 18 U.S.C. § 3663–3664...."). Notably, the district court had the discretion to take DeMonte's financial resources into account when ordering him to pay restitution. *See* 18 U.S.C. § 3664(a) ("The court, in determining whether to order restitution under section 3663 of this title and the amount of such restitution, shall consider ... the financial resources of the defendant ...."); *see also* U.S.S.G. § 5E1.1, comment. (backg'd) (same).

5. Before DeMonte was ordered by the court to make restitution, DeMonte had voluntarily agreed to do so in his plea agreement. However, DeMonte's actual conduct in making restitution was not simply an attempt to fulfill the obligation that he had voluntarily undertaken; he did not volunteer to completely liquidate all of his assets within a matter of weeks pursuant to his plea agreement. To the contrary, DeMonte made restitution in the manner he did solely because he was compelled to do so by the court. Had DeMonte liquidated his assets so promptly simply in order to fulfill his obligation pursuant to the plea agreement, then I would agree with Judge Celebrezze, *infra*, concurring in part and dissenting in part, that this would be unusual enough to merit a downward departure under the first prong of the *Brewer* test.

Finally, allowing probation in this case seems to defeat the federal sentencing guidelines' expressed desire to put white-collar crimes on a par with "street crimes" as far as incarceration is concerned:

Under pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax evasion, antitrust offenses, insider trading, fraud, and embezzlement, that in the Commission's view are "serious." The Commission's solution to this problem has been to write guidelines that classify as serious many offenses for which probation previously was frequently given and provide for at least a short period of imprisonment in such cases. The Commission concluded that the definite prospect of prison, even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm.

U.S.S.G. Ch.1, Pt.A(4)(d), *quoted in Brewer*, 899 F.2d at 507 (different version quoted). The *Brewer* court also quoted an article written by Judge Stephen Breyer, one of the authors of the guidelines:

The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white-collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate the *inequities* of these *discrepancies*, the Commission decided to *require* short but certain terms of confinement.

. . . .

The Commission took this course for two reasons. First, the Commission considered present sentencing practices, where white-collar criminals receive probation more often than other offenders who committed crimes of comparable severity, to be unfair. Second, the Commission believed that a short but definite period of confinement might deter future crime more effectively than sentences with no confinement condition.

*Brewer*, 899 F.2d at 508 (quoting Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L.Rev. 1, 20, 22). This is not to say that there are no circumstances in which restitution might cause an appropriate downward departure resulting in probation for a white-collar convict. Such circumstances, however, as discussed above, are not present in this case. To the extent, then, that the district court used DeMonte's restitution to drop the total offense level to the point where probation could be imposed without any confinement, *see* U.S.S.G. § 5B1.1(a)(1), the sentence manifests the very same unequal treatment of white-collar and "street" criminals that the sentencing guidelines sought to eradicate.

## B. Cooperation

The district court also asserted that De-Monte's "extraordinary level of cooperation" with the authorities supported its decision to depart. Admitting to offenses of which the government had no knowledge and exposing himself to increased criminal liability was, in the view of the district court, an action above and beyond that contemplated by the sentencing guidelines.

The court relied upon *United States v. Lieberman*, 971 F.2d 989 (3d Cir.1992). In that case, the defendant, when confronted by bank authorities, immediately admitted that he was embezzling funds from the bank. *Id.* at 991. He explained to managers of the bank how he was able to avoid detection, and resigned his position contemporaneously with these admissions and revelations. He pled guilty. Though he was formally charged with embezzling about $94,000, he agreed to repay the bank approximately $140,000 (which the bank asserted he owed). *Id.* The district court determined that these facts constituted a special circumstance of acceptance of responsibility above and beyond that contemplated by the guidelines, and granted the defendant a *one*-level downward departure. *Id.* at 992.

The Third Circuit affirmed. It suggested that the defendant's "admission of the full extent of his wrongdoing when confronted by bank officials, resignation of his position at the bank shortly after being confronted with the improper transactions, and voluntary and truthful admissions to the authorities" fell within the range of conduct the commissions meant the two-level reduction for acceptance of responsibility to address. *Id.* at 996. Deferring to the district court's discretion, however, it viewed the defendant's meetings with bank officials, concerning how to prevent certain types of embezzlement and his repayment of more than he was formally charged with embezzling, as sufficient grounds for the one-level departure. *Id.*

In the present case, the government readily admits that DeMonte cooperated fully. The government contends, however, that this constituted nothing more than what was required of him. Thus, the government claims, the departure cannot pass muster under the first part of the *Brewer* test. Further, the government also challenges the district court's factual determination that DeMonte's admission of another theft subjected himself to increased criminal liability. Thus, the government contends, the departure cannot pass muster under the second part of the *Brewer* test. Finally, the government argues that the degree of the district court's departure is unreasonable, so the departure fails the third part of the *Brewer* test.

### 1. Defendant's conduct was sufficiently unusual

■ The government argues that DeMonte's conduct was required by both the Plea Agreement and U.S.S.G. § 3E1.1, comment. (n.1(a)) (voluntary and truthful admission to authorities of involvement in the offense and relevant conduct), and so was not sufficiently unusual to survive the *Brewer* test. We disagree.

While DeMonte's admission that he committed a prior theft of which the government was completely unaware was formally required under the terms of the Plea Agreement, it was nevertheless a manifestation of an unusual willingness to cooperate. First, DeMonte could have bargained for a plea

agreement that did not require the potentially damning disclosure. From this it follows that DeMonte voluntarily undertook his obligation to disclose the prior theft. Second, and more importantly, as a practical matter, had DeMonte kept the prior theft a secret notwithstanding the existence of the plea agreement, it is highly unlikely that authorities would have found out about it. Thus, there is no sense in which DeMonte was forced or compelled, either by the government or by the plea agreement, to risk disclosing the prior theft. Under these circumstances, it was unusual indeed for DeMonte to have made the disclosures that he did.

We are not holding, of course, that merely abiding by the terms of one's plea agreement constitutes grounds for a downward departure. We are holding, however, that in the absence of any hint by the government that it suspected anything, DeMonte's potentially damning admissions are not the sort of admissions that judges expect to hear every day. This is true regardless of whether the admissions were made pursuant to a plea agreement or not.

Further, DeMonte's conduct does not come under § 3E1.1, comment. n. 1(a) insofar as the prior theft was not "relevant conduct." The prior fraud was a separate and distinct operation, using a different fictitious company as payee, and a different post office box in a different city as his address. There was apparently a break of about a year and a half between DeMonte's prior fraudulent activities (of which the government knew nothing) and those to which he pled guilty. *See* J.A. at 46–47.

Therefore, DeMonte's level of cooperation was indeed sufficiently unusual to warrant departure.

### 2. Defendant subjected himself to increased liability

■ The government correctly points out that under the terms of the Plea Agreement, the government could not further prosecute DeMonte based upon any information he gave concerning other acts of fraud, nor could it use such information to enhance his sentence. Thus, in the government's view,

the district court's finding that DeMonte subjected himself to increased punishment by "coming clean" is not supported by the record.

However, even though the *federal* authorities agreed not to use the information which DeMonte provided against him, DeMonte's revelations exposed him to potentially increased *state* criminal liability. *Cf. United States v. Roberson,* 872 F.2d 597, 610–12 (5th Cir.) (state agreement with defendant not to prosecute in return for cooperation had no bearing on whether federal authorities could prosecute because the agreement did not include federal authorities), *cert. denied,* 493 U.S. 861, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989); *United States v. Jordan,* 870 F.2d 1310, 1316 (7th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989).

Therefore, we cannot say that the district court's finding—that DeMonte's level of cooperation subjected him to the possibility of increased punishment—was clearly erroneous. The government does not question any of the district court's other findings of fact, and so we conclude that the court's downward departure from the guidelines passes muster under the second step of the *Brewer* test.

### 3. Reasonableness

The government argues that, even if we find that the district court had the power to depart on the basis of the circumstances of this case, the downward departure of *seven* levels was patently unreasonable. Because we are remanding for resentencing in light of our reversal of one of the two bases for the district court's downward departure, we do not reach this issue at this time.

### C. Comparison between Restitution and Cooperation as Bases for Making a Downward Departure in the Present Case

Apparently, Judges Batchelder .and Celebrezze each believe that the two grounds for downward departure presented in the instant case are both on an equal footing. In her concurrence in part and dissent in part, *infra,* Judge Batchelder suggests that they are both equally invalid. In his separate concur-

rence in part and dissent in part, *infra,* Judge Celebrezze suggests that they are both equally valid. I respectfully disagree with each of these views, and in this section, I seek to clarify three of the differences between these bases under the circumstances presented in the instant case.

First, the lower court ordered DeMonte to liquidate his assets within two weeks in order to make restitution, whereas DeMonte voluntarily entered into a plea agreement requiring disclosure of prior thefts. This implies that DeMonte's cooperation was voluntary in a way that his attempt to make restitution was not.

Second, the court had ample means to determine, before it imposed a sentence upon DeMonte, whether DeMonte complied with the court's order to liquidate his assets, but had virtually no means to determine whether DeMonte complied with his obligation to disclose prior thefts. Thus, DeMonte had reason to believe that he could keep his prior theft a secret, but he could not have reasonably believed that he could keep a failure to liquidate his assets a secret.

Third, one's ability to significantly liquidate one's assets is an economic consideration. As such it should not provide a basis for a downward departure. *See, e.g., Rutana,* 932 F.2d at 1159. On the other hand, one's ability to disclose a prior crime is a non-economic consideration. Rewarding such behavior with a downward departure does not present the danger of unfairly discriminating on the basis of economic status. Similarly, to the extent that white collar criminals tend to have more assets to liquidate than street criminals, rewarding the liquidation of assets may result in the sort of unequal treatment favoring white collar criminals that the sentencing guidelines sought to eradicate. On the other hand, because a white collar criminal is no more able to make unanticipated disclosures of prior crimes than a street criminal, rewarding such disclosures is unlikely to result in any corresponding inequity.

### III. Conclusion

In light of the foregoing, we reverse the district court's decision to depart based on

DeMonte's restitutionary payments, we affirm the decision to depart based on DeMonte's extraordinary cooperation, and we remand for resentencing in accordance with this decision.

BATCHELDER, Circuit Judge, concurring in part and dissenting in part.

While I agree with Judge Jones that DeMonte's restitution in this case cannot support the downward departure taken by the district court, I do not agree that DeMonte's cooperation with the government was sufficiently unusual to support the downward departure. I therefore dissent.

The majority's view on the cooperation issue is wholly unsupportable. The majority writes,

> While DeMonte's admission that he committed a prior theft of which the government was completely unaware was formally required under the terms of the Plea Agreement, it was nevertheless a manifestation of an unusual willingness to cooperate. First, DeMonte could have bargained for a plea agreement that did not require the potentially damning disclosure. From this it follows that DeMonte voluntarily undertook his obligation to disclose the prior theft. Second, and more importantly, as a practical matter, had DeMonte kept the prior theft a secret notwithstanding the existence of the plea agreement, it is highly unlikely that authorities would have found out about it. *Thus, there is no sense in which DeMonte was forced or compelled, either by the government or by the plea agreement, to risk disclosing the prior theft.* Under these circumstances, it was unusual indeed for DeMonte to have made the disclosures that he did.

> *We are not holding, of course, that merely abiding by the terms of one's plea agreement constitutes grounds for a downward departure.* We are holding, however, that in the absence of any hint by the government that it suspected anything, DeMonte's potentially damning admissions are not the sort of admissions that judges expect to hear every day. This is true

regardless of whether the admissions were made pursuant to a plea agreement or not. Maj. op. at 349 (emphasis added).

The majority *is* holding, of course, that "merely abiding by the terms of one's plea agreement constitutes grounds for a downward departure," although its protest to the contrary indicates that it does recognize, in theory, the folly in permitting simple compliance with one's plea agreement to support a downward departure. By stating that DeMonte was not "forced or compelled" by the plea agreement to reveal his earlier schemes, the majority implicitly denies the unquestionable enforceability of that agreement. Upon acceptance by the district court, the plea agreement became a "type of contract," a type immune to *sua sponte* modification or selective enforcement by the court. *United States v. Skidmore*, 998 F.2d 372, 375–76 (6th Cir.1993); *accord United States v. Olesen*, 920 F.2d 538, 540–41 (8th Cir.1990); *United States v. Partida–Parra*, 859 F.2d 629 (9th Cir.1988). The government performed its end of the deal. DeMonte's signature on the plea agreement bound him to do the same.

The majority, however, concludes otherwise. Have plea agreements come to mean nothing more than unilateral commitments on the government's part? Does not the government have the right to take each case to trial, without so much as a thought to entering into a mutually beneficial bargain with the defendant? Does a man's word mean so little that when, in exchange for a benefit, he promises to disclose other fraudulent activities, it can be said that unless he can effectively be "forced or compelled" to keep his word, his adherence to the contract is "unusual indeed"? It is an insult to DeMonte himself—one who has shown great signs of penitence and moral fortitude—to say that his word meant nothing. And could the government, adopting the majority's view, maintain that this information was not provided pursuant to the plea agreement and thus not subject to the government's commitment not to use it in the calculation of DeMonte's sentence and not to file additional charges against him?

Does the majority really believe that De-Monte's conduct was not required by the plea

agreement? What would have happened if the government had done a brief investigation of DeMonte's work and found another pattern of fraud, which DeMonte had not disclosed? Certainly, under the plea agreement, the government would have been entitled to withdraw from the agreement and take DeMonte to trial not only on the charge in the one-count Information, but also on every other known fraudulent act. *See* Plea Agreement ¶ 6 (quoted in maj. op. at 345 n. 2). This condition substantially upped the ante, providing DeMonte strong incentive to abide by his promise. Why does this not qualify as an enforceable provision of the plea agreement? Quite revealing is the majority's complete failure to provide any supporting law for this novel proposition.

Under the first step of *United States v. Brewer,* 899 F.2d 503, 506 (6th Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990), we must consider whether, as a matter of law, DeMonte's conduct is sufficiently unusual to warrant departure. Although DeMonte's agreement to enter into a contract in which he promised to disclose his other fraudulent activities was commendable, his compliance with his own bargain was not sufficiently unusual to warrant departure. Compliance with a plea agreement that has been approved by the court is not sufficiently unusual to warrant downward departure, unless the defendant's performance under the plea agreement is above and beyond the call of duty, making the case unusual and extraordinary. Presumably, the government takes into account the defendant's obligations under the plea agreement in making its offer to compromise, and the added benefit of a downward departure is rarely warranted simply because one abides by his plea agreement. *See* U.S.S.G. § 6B1.2 (p.s.) [Standards for Acceptance of Plea Agreements] ("A defendant who enters a plea of guilty in a timely manner will enhance the likelihood of his receiving a reduction in offense level under § 3E1.1 (Acceptance of Responsibility). *Further reduction in offense level (or sentence) due to a plea agreement will tend to undermine the sentencing guidelines."* § 6B1.2 comment. (emphasis added).). Consider the Sentencing Commission's view:

If the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a departure below the applicable guideline range for that offense may be warranted. For example, a downward departure under this section might be considered where a defendant, motivated by remorse, discloses an offense that otherwise would have remained undiscovered. *This provision does not apply where the motivating factor is the defendant's knowledge that discovery of the offense is likely or imminent, or where the defendant's disclosure occurs in connection with the investigation or prosecution of the defendant for related conduct.*

U.S.S.G. § 5K2.16 (p.s.) [Voluntary Disclosure of Offense] (emphasis added). In this statement the Commission rejects the majority's view that DeMonte's disclosures were a proper basis for a downward departure; the Commission approves as worthy of a downward departure *voluntary* disclosures *motivated by exemplary character,* not disclosures made "in connection with the investigation or prosecution of the defendant for related conduct." The majority states that "DeMonte's conduct does not come under § 3E1.1, comment. n. 1(a) insofar as the prior theft was not 'relevant conduct.'" *See* maj. op. at 349. But it should be noted that in § 5K2.16 the Commission avoided using the term of art "relevant conduct," choosing instead to use the generic language "related conduct." While not conclusive, this suggests that DeMonte's other fraud scheme is taken into account by the Guidelines and thus should not be given special status. Moreover, the proposed plea bargain alerted DeMonte to the government's suspicion that DeMonte, having committed one fraudulent scheme, may have committed others. It is therefore reasonable to suppose that DeMonte felt that investigation and discovery of his other scheme were "likely or imminent," a motivating factor on which a downward departure may not be based under § 5K2.16. In any event, DeMonte's acceptance of the plea agreement decisively established his

previous scheme as "related" to the discovered offense for the purpose of § 5K2.16. Because DeMonte's disclosure of his other offense was required by his plea agreement, and further, is a factor taken into account by the Guidelines, *see* §§ 3E1.1, 5K1.1 (p.s.) comment. (n.2), 5K2.16 (p.s.), the majority errs in approving the downward departure based on DeMonte's disclosure of another fraud scheme.

The majority notes with apparent approval the district court's use of *United States v. Lieberman,* 971 F.2d 989 (3d Cir.1992), in support of the downward departure. The distinguishing feature here is that DeMonte's confession followed his promise in his plea agreement to confess, while Lieberman's admissions immediately followed confrontation by the bank authorities and occurred before any criminal investigation and long before any anticipated quid pro quo. DeMonte's confession was bargained for; Lieberman's was given without any expectation of reward or benefit. Clearly, *Lieberman* is materially different from this case. The majority's view essentially holds that it is "sufficiently unusual" for a defendant to abide by his plea agreement. This is a view that I believe this Court cannot and should not take. I would hold that the district court's departure based on DeMonte's cooperation was reversible error.

The majority declines to review the extent of the district court's departure. Were my colleagues to address the issue, I should hope they would conclude, as I do, that the magnitude of the departure is unacceptable. The third step of *Brewer* requires that the departure be " 'measured by a standard of reasonableness.' " *Brewer,* 899 F.2d at 506 (citation omitted). The guideline range was 12–18 months based on an offense level of 13 and a criminal history category of I. The court departed downward to an offense level of 6, leaving a guideline range of 0–6 months. The court then sentenced DeMonte to probation. When one considers that the Sentencing Commission assigned only two points for the acceptance-of-responsibility credit, this additional seven-level departure can hardly be justified on reasonableness grounds: if, in the Commission's view, owning up is good for two points, how can owning up big be worth two plus seven points? *Cf. Lieberman,* 971 F.2d at 994–96 (departure of *one* level upheld for immediate confession and voluntary restitution of $34,000 more than defendant thought he owed). The departure is even more unreasonable in light of fact that, after giving DeMonte a seven-level reduction in his offense level, the district court then sentenced him at the very bottom of the post-departure guideline range. The extent of the departure here is clearly unreasonable and thus does not satisfy the third step of *Brewer.*[1]

It is generally known that many district courts would like more discretion in sentencing. District courts may at times feel that the Guidelines reach harsh, even unjust, results. However, the solution to this problem lies not with the courts but with Congress, and until Congress changes the Guidelines, the courts must follow the law. I believe that the sentence of the district court should be vacated in its entirety and this case remanded for resentencing within the guideline range.

I respectfully dissent.

CELEBREZZE, Senior Circuit Judge, concurring in part, dissenting in part.

I concur in the majority opinion's holding that DeMonte's extraordinary degree of co-

---

1. Judge Jones's discussion (in relation to the restitution issue) of the Commission's intent to eliminate the disparities in sentencing between white-collar crimes and similar common-law crimes (in which I concur) is equally applicable to the downward departure the majority sanctions on the cooperation issue. Judge Jones quotes *Brewer* (quoting Judge Breyer's article) for this point: "[T]he Commission decided to *require* short but certain terms of confinement [for white-collar criminals]." (Emphasis added by *Brewer* court). And Judge Jones himself writes, "To the extent, then, that the district court used DeMonte's restitution to drop the total offense level to the point where probation could be imposed without any confinement, the sentence manifests the very same unequal treatment of white-collar and 'street' criminals that the sentencing guidelines sought to eradicate." Maj. op. at 348 (citation omitted). I believe the same must be said regarding DeMonte's cooperation: To the extent that the district court used DeMonte's cooperation to drop the total offense level to a point where probation could be imposed without any confinement, the court violated both the letter and the spirit of the guidelines.

operation with the government was sufficiently unusual to support a downward departure. I must, however, respectfully dissent from that part of the majority opinion which finds that the downward departure given to DeMonte was error in so far as the district court judge made his decision to downwardly depart based upon DeMonte's acts of restitution. I write separately to more fully explain why I would affirm the order of the district court in its entirety.

A court is required to impose a sentence within the range defined by the Guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). The district court must limit itself to the Sentencing Guidelines, the policy statements, and the official commentary of the Sentencing Commission. *United States v. Joan,* 883 F.2d 491, 493 (6th Cir.1989). The guidelines are meant to cover "heartland" type cases where departures are only warranted for atypical cases "to which a particular guideline linguistically applies, but where conduct significantly differs from the norm." U.S.S.G. Ch. 1, Pt.A4(b).

The Sixth Circuit has pronounced that "there must be something 'special' about a given offender, or the accoutrements of the crime committed, which distinguishes this case from the mine-run of that offense." *United States v. McDowell,* 902 F.2d 451, 455 (6th Cir.1990), *citing United States v. Aguilar–Pena,* 887 F.2d 347, 350 (1st Cir.1989). The court must state the specific reason for the departure from the Guidelines. 18 U.S.C. § 3553(c)(2); *United States v. Newsome,* 894 F.2d 852, 856 (6th Cir.1990). In *United States v. Brewer,* 899 F.2d 503 (6th Cir.), *cert. denied* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990), this circuit has adopted a three tier approach in reviewing a district court's decision to depart from the guidelines as follows:

1. The reviewing court must determine, as a matter of law, if the case is sufficiently unusual to warrant departure.

2. The reviewing court must determine if the facts supporting the departure exist. Since this is a factual determination, this court will only review for clear error.

3. The reviewing court must determine whether the direction and degree of departure was reasonable. 18 U.S.C. § 3742(e)(3).

*United States v. Brewer,* 899 F.2d at 506.

If this court concludes that the district court's reasons for departure were adequately considered by the guidelines, then this court's review need go no further. *United States v. Hays,* 899 F.2d 515, 519 (6th Cir. 1990). Though the majority would conclude that is the case *sub judice,* I differ.

In the case at bar, the district court judge determined there were two mitigating circumstances "both of a kind and to a degree not considered by the Sentencing Commission." I believe we risk a great injustice when concentrating our efforts into breaking down each stated reason for departure into separate and distinct elements without also viewing these reasons in the context of the whole proceedings. It seems to me that we must judge each event in its totality if we are to reach a fair and just decision. Nevertheless, I will attempt to articulate why I feel that, even when viewing the restitution in isolation, this court should affirm the conclusions of the district court.

The district court explained that, although restitution is a factor taken into consideration by the Guidelines, the degree to which defendant made restitution exceeded that contemplated. The court elucidated its holding, recognizing that defendant liquidated *all* of his assets and was left with only the clothes on his back. Clearly, this case does not represent the typical conduct exhibited in criminal cases in this circuit. Likewise, it must also be appreciated that it was defendant who turned himself in before the police came looking for him. When defendant became aware of an investigation being conducted at the Veterans Affairs Finance Center, he immediately retained counsel and turned himself in. This is not to excuse his illicit behavior in any way. I readily acknowledge that the discovery of his criminal

conduct was inevitable. Nevertheless, I believe we must also weigh the unusually responsible behavior exhibited by the defendant in this case and the voluntariness of his actions.

Defendant entered into a plea agreement whereby he agreed to make restitution in the amount of approximately $46,000.00. On May 24, 1991, defendant appeared in court for sentencing. The Pre-sentence Report indicated that defendant had assets worth $31,-769.99. The court directed defendant to liquidate his assets within two weeks. When defendant returned for sentencing, he had only the clothing on his back and twenty dollars in his pocket. The district court determined that "... defendant's full restitution to the extent possible to the government and [his] willingness to completely liquidate all prior to sentencing ..." warranted a downward departure. Upon appeal by the government, this court remanded the case for the district court to articulate the basis and reasonableness of its departure.

Upon remand, the district court acknowledged that restitution is a factor contemplated by the Guidelines. The court, however, again stated that it was both the degree of restitution and the manner in which it was made which distinguishes the defendant's behavior in this case from the typical instances of restitution contemplated by the Guidelines. In other words, despite the fact that defendant agreed to make restitution and despite the fact that he did so at the district court's discretion, there was still something extraordinary about defendant's behavior.

I agree with the conclusion of the district court judge. The fact that the restitution was done so totally, completely and quickly does differentiate this behavior and persuades me that this conduct is sufficiently different from the norm so as to warrant a downward departure. This type of behavior should not simply be dismissed under the guise that he was obligated to so perform. Such a view ignores the realities of life.

Applying the *Brewer* test to the facts *sub judice*, the majority finds that, as a matter of law, defendant's restitution was not sufficiently unusual to justify a departure. I disagree. The facts of this case demonstrate that defendant's restitution was well beyond the norm. In *Brewer* this court held that "[u]nless the defendants have proved that their voluntary repayment of the embezzled funds constitutes an 'exceptional circumstance,' a downward departure based on this factor is not warranted." *United States v. Brewer*, 899 F.2d at 509, *citing United States v. Bolden*, 889 F.2d 1336 (4th Cir.1989). This court specifically held in *Brewer* that the sentence imposed, under the Guidelines, had taken into consideration the restitution made. Nevertheless, it is clear from *Brewer*, that when the facts surrounding the restitution indicate an "exceptional circumstance", a downward departure may be warranted.

The majority also relies on *United States v. Harpst*, 949 F.2d 860 (6th Cir.1991). In that case, the court discussed whether incarceration and its detrimental effect on the defendant's ability to make restitution is an available ground for departure. *Harpst*, however, merely stands for the proposition that the *ability* to make restitution cannot be the basis for a downward departure. The reasoning behind this holding is that it would nurture disparate sentences based upon socioeconomic class distinctions.

In the case at bar, defendant did not make a full and complete restitution. He was in fact, ordered to do so by the court, but he was unable to make full restitution at that time. In other words, it was not his ability to pay, rather, it was the method in which he attempted to make restitution. Moreover, simply because a defendant might or might not have the ability to make restitution, he should be judged by his actions. The fact that he may have some economic means should neither be held for him or against him. To suggest that when a defendant is affluent, his attempts at restitution can never qualify as an exceptional circumstances is as repugnant to equal protection ideology as to hold the lack of ability to make restitution against an indigent defendant. It is clear that in some cases, the *methods* by which a defendant makes restitution may qualify as an exceptional circumstance, above and beyond what is considered in the Guidelines.

The majority also raises this issue, to-wit: that white collar criminals must be treated equally with other convicted criminals. I have no quarrel with this proposition. I believe, however, that where, as here, a crim-

inal goes to the extreme in making restitution and cooperating with authorities, his behavior may exceed that contemplated by the Guidelines. The defendant in *Harpst* did not attempt to make restitution, much less to the extent made by DeMonte in the case at bar. It seems to me that, conversely, by comparing the behavior of the defendant in *Brewer* or *Harpst* to the case at bar, DeMonte's conduct was clearly "sufficiently unusual" thus warranting a departure.

I must again note that the district court judge relied on two reasons for departure. It seems to me that, even assuming *arguendo* that neither of the two reasons would suffice on its own, the combination of the two [1] could indeed distinguish this case from the heartland type of cases contemplated by the Guidelines.

The district court's second reason for departure was the "extraordinary level of cooperation [of defendant] by providing the government with extensive information regarding crimes with which he was not even charged." The government argues that defendant merely adhered to the terms of his plea bargain. The district court, however, noted that defendant admitted to a theft of $30,000.00 from the government which the government *was not even aware of* and for which defendant was not being prosecuted. The government simply dismisses this conduct by stating that defendant was obligated to confess. No cases in which a defendant offered similar cooperation or in which a district court denied a downward departure for this level of extraordinary cooperation are cited. It seems to me that this type of cooperation is exceedingly unusual.

Finally, the government asserts that a seven level reduction of the sentence was unreasonable. In light of all of the facts of the case, and bearing in mind that the district judge was in a better position to observe the credibility of the witnesses, it seems that reducing defendant's sentence from a term of twelve to eighteen months imprisonment down to three years probation does not seem to me to be unreasonable. As was stated by the district court judge, "[t]his court has no greater obligation than to see that justice is accomplished in every case." The district court thus determined that an appropriate downward departure was warranted. Based on the facts of the individual case before us, and in the interest of justice, I fully concur with the reasonableness of the downward departure.

To subscribe to the position the majority urges would remove *any* of the discretion that a district court judge has in sentencing. While it is true that district court judges have retained very little discretion in sentencing matters, the Sentencing Commission has made it clear that, in an exceptional case, the district judge does indeed have some discretion. I believe that the district court, in the instant case, was correct in determining that this case presents sufficiently unusual circumstances to warrant a downward departure. I also believe the degree and direction of the departure was reasonable and appropriate. Accordingly, the district court judge was within his prerogative to depart from the Guidelines in the instant case. I would, therefore, affirm the Order of the district court.

---

1. This does not mean to imply there is a synergistic effect, although such a result could be real. Rather, it is merely cumulative in nature.